## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF RHODE ISLAND

---

In re:   Scott Louis DeLotto                                     BK No: 15-10648
Debtor                                                          Chapter 7

---

## <u>DECISION AND ORDER</u>

Debtor Scott DeLotto filed four motions titled "Motion for Imposition of Sanctions and

Other Relief for Willful Violation of Automatic Stay" (Doc. ## 7, 12, 24, 44) (collectively, the

"Motions") against Liberty Life Assurance Company of Boston ("Liberty Life").[1] The Motions

are essentially the same but are cumulative; each successive motion accounts for each monthly

transaction by Liberty Life that took place between April and July 2015 against Mr. DeLotto's

benefits payable under a disability insurance policy. He alleges that these transactions constituted

"setoff" in violation of Bankruptcy Code §§ 362(a)(6) and (7).[2] Liberty Life filed its Opposition

to Motion for Imposition of Sanctions and Other Relief for Willful Violation of Automatic Stay,

supplemented by the filing of certain key cases it cited (Doc. ## 34, 35) ("Objection").

Liberty Life defended its actions on the grounds that these transactions are in the nature

of recoupment, not setoff, and therefore not stayed in bankruptcy. I afforded Mr. DeLotto the

opportunity to respond to the Objection, which he did by filing a Response to Opposition to

Motion for Imposition of Sanctions and Other Relief for Willful Violation of Automatic Stay

(Doc. #53) ("DeLotto Response"). I held a hearing on the matter on September 2, 2015, and I

directed the parties to further supplement their filings through submission of affidavits and

certain documents both parties discussed at the hearing, with the opportunity to respond to such

---

[1] The Motions refer to Liberty Mutual Insurance Company, a/k/a Liberty Mutual Group and Liberty Life Assurance Company of Boston.

[2] Unless otherwise indicated, the terms "Bankruptcy Code," "Code," "Chapter," "Section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

supplemental filings. Liberty Life filed its Submission in Further Support of Opposition to

Motion for Imposition of Sanctions and Other Relief for Willful Violation of Automatic Stay,

Affidavit of Paula McGee, and Exhibits (Doc. #66), and Mr. DeLotto filed his Ordered

Submission in Support of Motions for Sanctions, Affidavit of Scott DeLotto, and Exhibits (Doc.

#67). Both parties filed their additional responses to these respective affidavits: Liberty Life's

Response to Debtor's Ordered Submission in Support of Motion for Sanctions (Doc. #68)

("Liberty Life Supplement") and Mr. DeLotto's Response to Submission in Further Support of

Opposition to Motion for Sanctions and Other Relief for Willful Violation of Automatic Stay

(Doc. #69) ("DeLotto Supplement"). I took the matter under advisement on September 23, 2015.

    While I empathize with Mr. DeLotto and his family over the difficult physical, emotional,

and financial circumstances they face due to Mr. DeLotto's medical condition that has rendered

him permanently disabled, I cannot ignore the applicable law and must deny the Motions. These

transactions constitute recoupment and the automatic stay does not bar Liberty Life from

exercising such rights by reducing Mr. DeLotto's ongoing post-petition benefits under the

disability policy until the overpayment is recouped in full.

## I.    Jurisdiction

    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and

DRI LR Gen 109(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).[3]

---

[3] Liberty Life obliquely asserts by way of a footnote in the Liberty Life Supplement that because Mr. DeLotto's
claims are in essence claims for benefits under ERISA, it is "unlikely" that this Court has jurisdiction over the
claims, referencing the United States Supreme Court decisions *Stern v. Marshall*, 131 S.Ct. 2594 (2011) and
*Wellness Int'l Network Ltd. v. Sharif*, 135 S.Ct. 1932 (2015). It does not develop this argument, nor does it raise any
objection to this Court's entry of a final order in this matter. It is important to note that bankruptcy courts in fact
have jurisdiction over so-called "*Stern* claims"; the limitation as held in these two cases is that bankruptcy courts
lack the constitutional authority to render final judgments or orders on such claims absent the parties' express or
implied consent. Hence, even if the claims presented here were *Stern* claims, Liberty Life has impliedly consented to
their final adjudication by this Court. *See also Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 645 (1st Cir.
2000) (holding that failure to brief an argument constitutes waiver); *Blacksmith Invs., Inc. v. Woodford (In re
Woodford)*, 418 B.R. 644, 646 n.1 (B.A.P. 1st Cir. 2009) (same). At any rate, Liberty Life mischaracterizes the
nature of this action. Mr. DeLotto's claims are not *Stern* claims because he alleges violations of the automatic stay.

## II.     Factual Background

The key facts are taken from the various filings of the parties and are not in dispute. Mr. DeLotto suffers from multiple sclerosis, which tragically progressed to the point of rendering him fully disabled. His former employer Fluor Corporation ("Fluor Corp.") maintained the Fluor Corporation Long Term Disability Plan ("LTDP"), one of several benefit plans offered to its employees as part of its overall employee welfare benefits package.[4] Fluor Corp. contracted with Liberty Life to administer the LTDP and to issue a group long-term disability insurance policy ("Policy") for the benefit of its employees. Upon his employment with Fluor Corp. in 2004, at no cost to him Mr. DeLotto became automatically enrolled in the LTDP and entitled to disability benefits in accordance with the terms and conditions of the Policy in the event he sustained a qualifying disability (as defined in the LTDP's applicable insurance policy).[5]

At some point during his employment, Mr. DeLotto chose to increase the basic benefit amount payable under the Policy as offered by his employer, and commenced paying the requisite monthly premium to his employer for this increased benefit. As time passed, his medical condition deteriorated and he was unable to continue to work, becoming fully disabled in December 2009. In May 2010, he applied for long-term disability benefits under the Policy. By letter dated July 21, 2010, Liberty Life determined that he was fully disabled as of late December 2009 and entitled to receive benefits under the Policy commencing June 18, 2010.

As such, his claims stem directly from the Bankruptcy Code (§ 362), and would not exist independently outside of Mr. DeLotto's bankruptcy case. *See Wellness*, 135 S.Ct. at 1941 ("Article III prevents bankruptcy courts from entering final judgments on claims that seek only to 'augment' the bankruptcy estate and would otherwise 'exis[t] without regard to any bankruptcy proceeding.'") (citing *Stern*, 131 S.Ct. at 2611, 2618).

[4] The LTDP is a qualified plan under the Employee Retirement Income Security Act of 1974 ("ERISA").

[5] The LTDP was originally administered by MetLife, Inc. (or one of its subsidiaries or affiliates) when Mr. DeLotto was first employed by Fluor Corp. It appears that in January 2008, well before he became fully disabled, Liberty Life became the plan administrator of the LTDP and issued the Policy covering the LTDP participants.

3

*See* Exhibit 1(b) appended to Affidavit of Paula McGee, Litigation Manager for Liberty Life

("McGee Affidavit") (Doc. #66). Mr. DeLotto began receiving monthly benefits of $6,250.00,

which amounted to approximately 60-65 percent of his pre-disability base earnings from Fluor

Corp.

According to Mr. DeLotto, approximately 13 months after he first began receiving these

monthly benefit payments, in June or July 2011, Liberty Life informed him that he had to apply

for Social Security Disability Insurance ("SSDI") in order to continue receiving his full monthly

disability benefits. This communication was followed by a letter from Liberty Life, which

included an agreement entitled "Social Security/Reimbursement Agreement" ("Reimbursement

Agreement"), that it required Mr. DeLotto to sign if he wanted his benefits to continue without

reduction pending the Social Security Administration's ("SSA") review of an application for

SSDI (the "Full Benefit Option").

The Reimbursement Agreement required Mr. DeLotto to apply for SSDI within 45 days

in the event he chose the Full Benefit Option; however, if he was awarded such benefits

retroactive to the date of his application, then he would be required to repay Liberty Life the

resulting overpayment caused by his continued receipt of his full benefit amount under the Policy

during such retroactive period. Additionally, by signing this agreement he would also be

agreeing that "Liberty Life [would have] a first lien on all such benefits to the extent of any

overpayment or debt, and [Mr. DeLotto would] agree to hold all such Social Security benefits in

a trust for the benefit of Liberty Life until the amount of Liberty Life's overpayment has been

repaid in full" if he was awarded SSDI. *See* Objection, Exhibit B. The Reimbursement

Agreement further informed him that if he failed to repay any overpayment of benefits, Liberty

Life "may withhold future disability benefits until the overpayment is recovered in full," as well

as pursue other available legal remedies. *Id.* Alternatively, if he did not execute the

Reimbursement Agreement and timely apply for SSDI, then his monthly benefits under the

Policy would be reduced by the estimated amount of such anticipated income (the "Reduced

Benefit Option"). Mr. DeLotto opted for the Full Benefit Option: to have his full benefit amount

continue while awaiting a determination on his eligibility for SSDI. He executed and returned the

Reimbursement Agreement to Liberty Life, and timely applied for SSDI.

      After a protracted period, including an appeal, he was approved for SSDI benefits and

awarded net retroactive benefits of $65,849.00 for the period of December 2009 through June

2013. In July 2013, he began receiving monthly SSDI of $2,081.00. In turn, his monthly

disability benefits under the Policy were reduced by this sum. He did not, however, receive the

retroactive SSDI lump-sum payment until January 2014.

      In the meantime, SSA advised Mr. DeLotto that based on his disability, his son—as his

dependent—was entitled to receive monthly SSDI benefits of $1,040.00. As a result, Mr.

DeLotto's monthly disability benefits under the Policy were then further reduced by that amount

to $3,129.00. On September 14, 2013, his son was also awarded a lump sum of $39,207.00 in

retroactive SSDI benefits. Mr. DeLotto states that he and his wife spent these funds on paying

medical expenses and making necessary alterations to the family residence to accommodate his

disability. He explains that he was completely unaware that such funds would be included in the

calculation of income by which his benefits would be reduced under the Policy, or that Liberty

Life would have a right to recover this retroactive award as an overpayment. As to his own

retroactive SSDI payment, according to Mr. DeLotto he deposited these funds in a bank account

while he attempted to negotiate with Liberty Life to forgive all or part of the overpayment arising

from his son's receipt of the derivative retroactive SSDI benefits. He was not successful in that

endeavor, and in February 2014 Liberty Life began to recover the total overpayment resulting from these retroactive awards by applying the full amount of his monthly benefits towards the overpayment. Faced with this financial dilemma and apparently unable to meet the family's financial needs, Mr. DeLotto began withdrawing $3,129.00 per month from the account into which he had deposited his retroactive SSDI payment, depleting all of these funds by October 2014.

On April 1, 2015, Mr. DeLotto filed his chapter 7 bankruptcy petition and notified Liberty Life of the filing. Liberty Life advised him of its position that the transactions at issue here are permissible recoupment, which it is entitled to effectuate under the Policy and are not barred by the automatic stay provisions of the Bankruptcy Code. As set forth in its May 16, 2014 correspondence, Liberty Life calculated the overpayment balance at that time to be $93,887.57, and it continued to recover the overpayment against Mr. DeLotto's post-petition monthly disability benefits.

## III.    Positions of the Parties

### A.    Mr. DeLotto

Mr. DeLotto argues that Liberty Life is willfully setting-off the amount of the pre-petition overpayment against his post-petition monthly disability benefits in violation of §§ 362(a)(6) and (7). To redress such violations, he claims entitlement to recover actual damages, punitive damages, attorney's fees, and costs as provided by § 362(k)(1). He also seeks an injunction under § 105(a) to enjoin these continued actions and require Liberty Life to pay him his post-petition disability benefits under the Policy.

B.      Liberty Life

In its Objection, to which a copy of the Policy and the Reimbursement Agreement are attached, Liberty Life counters that these transactions are not setoff but recoupment not stayed by § 362(a). In accordance with the Policy, Liberty Life calculates Mr. DeLotto's monthly benefits by deducting "Other Income Benefits," including any benefits he, his spouse, or his dependent child receive from SSA on account of the same disability for which Liberty Life pays benefits under the Policy. Therefore, Liberty Life argues, it is entitled to recoup the overpayment caused by the receipt of such other benefits against the monthly benefits payable to him under the Policy until the overpayment is fully recovered. Further, it maintains that Mr. DeLotto voluntarily executed the Reimbursement Agreement, which effectuated its rights under the Policy, in order for him to continue receiving his full benefits until a determination of eligibility for SSDI benefits was rendered. He expressly agreed that he would not only notify Liberty Life of any SSDI benefits awarded, but also repay any overpayment of benefits paid under the Policy resulting from the receipt of such other benefits. Finally, he agreed that if he did not repay the overpayment, then Liberty Life could withhold his future benefits until it was fully repaid.

IV.    **Applicable Law**

My first task in resolving the Motions is to determine if the transactions Mr. DeLotto complains of are in the nature of impermissible setoff stayed by § 362(a)(7) or recoupment which, under the controlling case law, is an equitable exception to the automatic stay.

A.      The Automatic Stay

Generally, when a stay violation is established, such as a creditor's setoff of a pre-petition debt against the creditor's post-petition obligation to a debtor, § 362(k)(1) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual

damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover

punitive damages." A debtor who invokes this section "bears the burden of proving by a

preponderance of the evidence the following three elements: (1) that a violation of the automatic

stay occurred; (2) that the violation was willfully committed; and (3) that the debtor suffered

damages as a result of the violation." *Slabicki v. Gleason (In re Slabicki)*, 466 B.R. 572, 577-78

(B.A.P. 1st Cir. 2012) (citing *In re Panek*, 402 B.R. 71, 76 (Bankr. D. Mass. 2009)); *see also*

*Witkowski v. Knight*, 523 B.R. 291, 297 (B.A.P. 1st Cir. 2014) (reiterating these elements).

      B.    <u>Recoupment Versus Setoff</u>

Setoff is defined by the Bankruptcy Code as "any right of a creditor to offset a mutual

debt owing by such creditor to the debtor that arose before the commencement of the case under

this title against a claim of such creditor against the debtor that arose before the commencement

of the case." 11 U.S.C. § 553(a). Setoff "is in the nature of a counterclaim, enabling a creditor to

reduce the amount of a claim against it by an amount owed to the creditor on a mutual *unrelated*

debt." *Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home,*

*Inc.)*, 273 B.R. 305, 311 (Bankr. D. Mass. 2002), *aff'd* 372 F.3d 1 (1st Cir. 2004) (emphasis

added).

Recoupment, on the other hand, "is a common law doctrine that is not expressly recognized

in the Bankruptcy Code, but is preserved through judicial decisions." *Aetna U.S. Healthcare, Inc. v.*

*Madigan (In re Madigan)*, 270 B.R. 749, 753-54 (B.A.P. 9th Cir. 2001). It is "the satisfaction of

an obligation by the crediting against it of a reciprocal obligation arising from the *same*

*transaction*, typically the same contract." *Holyoke*, 273 B.R. at 311 (quoting *In re Women's Tech.*

*Institute, Inc.*, 200 B.R. 77, 80 (Bankr. D. Mass. 1996)). "[T]he defensive use of recoupment in

bankruptcy is that there is no independent basis for a 'debt,' and therefore there is no 'claim' against estate property." *Madigan*, 270 B.R. at 754 (citations omitted).

The United States Court of Appeals for the First Circuit (among other circuit and bankruptcy courts) has held that recoupment is not automatically stayed in bankruptcy. *See, e.g., Slater Health Ctr. v. United States (In re Slater Health Ctr., Inc.)*, 398 F.3d 98, 103 (1st Cir. 2005) ("[A] valid recoupment . . . would not be affected by bankruptcy."); *Holyoke Nursing Home, Inc. v. Health Care Fin. Admin.*, 372 F.3d 1, 3-4 (1st Cir. 2004) ("[S]etoff . . . normally is barred by the automatic stay, . . . [but] recoupment . . . normally is not barred."); *see also In re Lord*, 284 B.R. 179, 180 (Bankr. D. Mass. 2002) ("Although setoff is clearly stayed by section 362(a)(7), courts have held that recoupment is not stayed automatically.") (citations omitted). The "recovery of overpayments constitute transactions in the 'nature of recoupment,' unaffected by bankruptcy proceedings, if the debt owed to the creditor arises out of the 'same transaction' as the debt the creditor owes the debtor." *Celi v. Trs. of Pipefitters Local 537 Pension Plan*, No. 10-11152-DJC, 2011 U.S. Dist. LEXIS 136514 (D. Mass. Nov. 28, 2011).

In determining whether recoupment applies, the "pertinent distinction between a setoff and a recoupment is whether the debt owed the creditor . . . arose out of the 'same transaction' as the debt the creditor owes the debtor." *Holyoke*, 372 F.3d at 3. The "common thread" of courts' determinations on the issue is that transactions arise from a single agreement:

> [T]he rights are derived from a single agreement. The contract often called for numerous, separate deliveries, services or payments over a period of time. In finding a single transaction, the courts looked to the agreement of the parties and found the conduct at issue within the scope of the agreement. It has not mattered whether the contract expressly provided for the recoupment, although some did.

*First Union Nat'l Bank v. Abbey Fin. Corp. (In re Abbey Fin. Corp.)*, 193 B.R. 89, 96 (Bankr. D. Mass. 1996). To find recoupment, however, "a mere logical relationship is not enough. . . . Rather,

both debts must arise out of a single integrated transaction so that it would be inequitable for the

debtor to enjoy the benefits of that transaction without also meeting its obligations." *Holyoke*, 273

B.R. at 311 (citations omitted). The mere fact that "the same parties and subject matter are involved

does not mean the claims arose from the same transaction." *In re Abbey Fin. Corp.*, 193 B.R. at 96

(citing *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984)). Therefore, "when determining

whether . . . recoupment should apply, the Court should ask whether the obligation being interposed

by the creditor 'is intrinsic to the primary cause.'" *In re Women's Tech. Inst.*, 200 B.R. 77, 81 (Bankr.

D. Mass. 1996).

**V.       Analysis**

     A.       <u>The Policy</u>

The provisions of the Policy that govern here arise primarily under sections 4 and 7 of the

Policy. Section 4 provides that the amount of the monthly disability benefit payable is

determined by:

> 1. Tak[ing] the lesser of: a. the Covered Person's Basic Monthly
> Earnings multiplied by the benefit percentage shown in the
> Schedule of Benefits; or b. the Maximum Monthly Benefit shown
> in the Schedule of Benefits; and then 2. Deduct[ing] Other Income
> Benefits and Other Income Earnings (shown in the Other Income
> Benefits and Other Income Earnings provision of this policy), from
> this amount.

The Policy defines "Other Income Benefits" as including:

> ... [t]he amount of Disability and/or Retirement Benefits under the
> United States Social Security Act . . . which: a. the Covered Person
> receives or is eligible to receive; and b. his spouse, child or
> children receives or are eligible to receive because of his
> Disability.

Section 4 further states:

> The Monthly Benefit payable will not be less than the Minimum
> Monthly Benefit shown in the Schedule of Benefits. *However, if an*

> *overpayment is due to Liberty* [Life]*, the Minimum Monthly Benefit otherwise payable under this provision will be applied toward satisfying the overpayment.*

(emphasis added).

Section 7 of the Policy provides that:

> Liberty [Life] has the right to recover any overpayment of benefits caused by, but not limited to, . . . 3. the Covered Person's receipt of any Other Income Benefits. . . . and it may recover an overpayment by, but not limited to, . . . 1. requesting a lump sum payment of the overpaid amount; 2. reducing any benefits payable under this policy; 3. taking any appropriate collection activity available . . . ; 4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis. It is required that full reimbursement be made to Liberty [Life].

Also pertinent is what is essentially a mandatory benefit election option ("Benefit Election Requirement") that comes into play once the insured's disability has continued for a long enough period of time to render him or her potentially eligible for benefits from other sources—such as a program under the SSA or a disability retirement plan. Under the heading "Estimation of Benefits" in section 4 of the Policy, it is disclosed to the LTDP participant that:

> Liberty [Life] will reduce the Covered Person's Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to the Covered Person and his dependents ["Reduced Benefit Option"]. The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person: 1. provides satisfactory proof of application for Other Income Benefits; 2. signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Liberty [Life] for any overpayment resulting from the award or receipt of Other Income Benefits ["Full Benefits Option"].

B.      Post-Petition Recovery of the Overpayment Constitutes Recoupment

I concur with Liberty Life that its recovery of the overpayment is recoupment not subject to the automatic stay. That right arises under the Policy and from the same integrated transaction

as Mr. DeLotto's right, and his son's right, to receive disability benefits under the Policy and his

corresponding obligation to repay the benefit overpayment. These on-going deductions from his

monthly benefits are "the satisfaction of an obligation by the crediting against it of a reciprocal

obligation arising from the *same transaction*." *Holyoke*, 273 B.R. at 311 (quoting *In re Women's*

*Tech. Inst., Inc.*, 200 B.R. at 80). In applying for and accepting the monthly benefits from Liberty

Life, Mr. DeLotto incurred all of the obligations as a beneficiary imposed by the Policy.

Likewise, in contracting with Fluor Corp. to administer its LTDP and accepting payment of the

premiums, Liberty Life incurred all of its obligations as insurer imposed by the Policy. As other

courts that have considered this issue have concluded, the Reimbursement Agreement is not

itself a separate transaction. It merely effectuates the express terms of the Policy, including the

Policy's Benefit Election Requirement and the Full Benefit Option that Mr. DeLotto selected

with its concomitant repayment obligations and Liberty Life's recoupment rights.

The facts here are substantially similar to those addressed in *In re Lord*, 284 B.R. 179

(Bankr. D. Mass. 2002), *In re Graves*, 234 B.R. 149 (Bankr. M.D. Fla. 1999), and *Aetna Life Ins.*

*Co. v. Bram (In re Bram)*, 179 B.R. 824 (Bankr. E.D. Tex. 1995). Those courts concluded that

the insurer's recovery of an overpayment of benefits to the insured is permissible recoupment

exempted from the automatic stay of § 362(a). I am unpersuaded by Mr. DeLotto's argument that

these cases are distinguishable. They are not. Indeed, the facts here are nearly the same as those

in the *Lord* case. In that case, the Bankruptcy Court for the District of Massachusetts concluded

that this same conduct by MetLife—withholding post-petition long-term disability benefits to

recover a pre-petition overpayment of such benefits owed by the debtor—arose out of the same

transaction and was, therefore, recoupment. It explained that the Policy:

> provided the Debtor's right to payment in the event of disablement
> during the policy period and provided for MetLife's right to reduce

> future payments in the event of overpayment due to non-reported
> payments from other sources, such as SSDI.

*In re Lord*, 284 B.R. at 181.

In so holding, the *Lord* court concurred with the similar determinations reached in the

*Bram* and *Graves* cases, noting that these cases:

> involved fact patterns similar to what is presented here. In both
> cases an insurance company overpaid pre-petition claims because
> the insured failed to report payments from other sources that would
> have reduced the insurance company's required payments. Both
> courts emphasized that the original insurance contracts contained
> explicit language granting the insurance companies the right to
> reduce benefits if other similar benefits were received from another
> source. In each case, because both the right to payment and the
> right to withhold payment arose from the same transaction,
> recoupment was appropriate.

*Id.*

In an effort to circumvent the application of the recoupment doctrine, Mr. DeLotto

attacks the Benefit Election Requirement and the recoupment provisions of sections 4 and 7 of

the Policy by asserting that he is not bound by these provisions because he was never aware of

them. He states that upon his employment with Fluor Corp., he was only provided a summary of

the benefits accorded to him through the LTDP, and Liberty Life only disclosed these provisions

to him in June or July 2011—long after he became disabled and had been receiving his disability

benefits under the Policy. He also makes much of the fact that the Policy was not the insurance

policy in effect when he was first enrolled in the LTDP and that Liberty Life was not even the plan

administrator at that time. So, he contends, he could not possibly have agreed to all the Policy terms.

From there, citing to general state law contract principles and several Rhode Island state cases, he

leaps to the conclusion that the "contract that was formed does not contain the 'overpayment' nor the

SSDI policy provisions that Liberty Life claims give it a right to recoupment." DeLotto Response at

8. Liberty Life counters that Mr. DeLotto in fact had constructive knowledge of these Policy terms and that, under ERISA, his professed lack of knowledge of these specific provisions is not necessary for the enforcement of the unambiguous terms of the Policy.

Mr. DeLotto's argument is a red herring. Liberty Life is correct that the express terms of the Policy govern and are enforceable regardless of Mr. DeLotto's awareness of these specific terms. It is important to place this issue in its proper context. Mr. DeLotto fails to distinguish between a disability insurance policy contracted for directly by a private individual and a group disability insurance policy contracted for by an employer as part of an ERISA-qualified plan for its employees. The general state contract law cited and heavily relied upon by Mr. DeLotto does not apply here; the controlling law is that under ERISA. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Emps.*, 974 F.2d 391, 395, 398 (3d Cir. 1992) (finding that a claim brought under ERISA claiming benefits due under informal employer benefit plan in which employees argued state contract law issues "must be resolved not under state law, but under ERISA."). It is Fluor Corp. that contracted with Liberty Life to provide long-term disability insurance to its employees under its ERISA-qualified LTDP. Mr. DeLotto neither contracted for nor purchased his own private disability insurance. As an automatic enrollee in the LTDP, he became a participant in that plan and a beneficiary of the insurance policies held by the plan. His entitlement to benefits under the Policy is subject to *all* of its terms and conditions, regardless of his knowledge, or lack of knowledge, of certain provisions.

In *Henglein*, the court reviewed the standards to determine if an informal employee benefit plan existed (obviously not an issue here), and faulted the lower court's consideration of the employees' lack of awareness of the actual terms of the various memoranda the employees alleged created the informal plan. The court explained that "ERISA does not require that a

beneficiary have any knowledge of a written plan's terms, and our federal jurisprudence has not imposed that requirement either." *Henglein*, 974 F.2d at 401-02 (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1367 (11th Cir. 1982) (discussing the standard to determine a plan's existence)). Mr. DeLotto's right to disability benefits springs from his automatic enrollment in and as a participant of the LTDP. Upon his qualifying disablement, he became entitled to disability benefits under the insurance policy carried by the LTDP at that time, expressly subject to the terms and conditions of such policy. He cannot cherry pick among the Policy terms so as to be bound to some but not to others he now finds objectionable. *See generally Heimeshoff v. Hartford Life & Accident Ins. Co.*, 134 S.Ct. 604, 611-12 (2013) (emphasizing that the written terms of an ERISA plan are to be enforced).

Mr. DeLotto's citation to numerous cases addressing the impact of nondisclosure of the terms of a contract (including an insurance contract) in support of his challenge to the binding effect of these specific Policy provisions is of no avail.[6] These provisions were conspicuously disclosed in the Policy. Mr. DeLotto had adequate notice when he first became a participant in the LTDP that he needed to review the actual disability policy and any subsequent policies maintained by the LTDP to learn of all of its detailed provisions governing his rights and obligations as a beneficiary. Indeed, his argument is dispelled by the supplemental documents he attached to his affidavit.

---

[6] *See* DeLotto Supplement at 10-11 and notes 12-15. In addition to being inapplicable because there was no failure on the part of Liberty Life to disclose policy terms, the cases cited by Mr. DeLotto are not persuasive because they do not involve employee benefit plans governed by ERISA. The one case cited as addressing ERISA preemption of a termination provision in a group medical insurance policy for employees, *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, was determined on appeal not to involve an insurance policy issued under an "employee benefit plan." 426 F. Supp. 316 (N.D. Ind. 1977), *aff'd* 567 F.2d 692 (7th Cir. 1977). The district court's conclusion that ERISA or federal common law governed was, therefore, rejected and the Seventh Circuit Court of Appeals concluded that state law controlled over that particular policy. *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 697-700 (7th Cir. 1977).

He protests that his former employer only provided him with "summaries" of the Policy that did not disclose the Benefit Election Requirement or the recoupment rights of the insurer accompanying the Full Benefits Option he selected. But a summary is just that—a brief abstract highlighting the benefits provided under the LTDP; by its very nature it does not purport to disclose all of the specific terms and conditions of the disability insurance policy under which the employee is a beneficiary. Mr. DeLotto is not an unsophisticated individual and is presumably fairly well educated, as demonstrated by his relatively high pre-disability earning capacity.[7] He was aware, or should have been, that these summaries did not spell out all of the precise terms and conditions that governed this employee benefit plan.[8] These summary documents notified him that the specific terms and conditions governing each of the benefit plans and programs they discussed were set forth in the underlying policies and contracts relating to the particular benefit being provided.

The Fluor Corp. employee benefits guide he was provided upon his employment, (which included a description of the LTDP) entitled "Benefits For You, Salaried Enrollment Guide 2004, Fluor," on the first page listing with the table of contents expressly notified employees:

> This information highlights the Fluor Corp[.] benefits program for salaried employees. Plans described are subject to the specific terms and provisions of the legal documents governing the plans. Provisions of the plans as established in the plan documents are the sole source for interpretation and administration of the plans and programs . . . .

---

[7] In the Motions, Mr. DeLotto represents that the initial monthly benefit amount Liberty Life paid him under the Policy was $6,250.00. Using a benefit estimate of approximately 60 percent of his base salary, the math tells us that he was earning approximately $125,000.00 at the time of his disablement in December 2009. I also note that his wife, who holds a law degree and is representing him in this matter, is in her own right well educated, apparently also holding a doctorate degree. *See* Motions, Appendix B.

[8] Mr. DeLotto's oral requests on two occasions in 2007 to a local employee of Fluor Corp. for a copy of the LTDP policy suggest that he knew he needed to review the actual policy terms. *See infra* further discussion in footnote 9.

> The company expects to continue the plans and programs described in this booklet, but reserves the right to change or discontinue such plans or programs at any time.

Affidavit of Scott DeLotto, Exhibit 1 (Doc. #67) ("DeLotto Affidavit"). The other summary document he appended to his affidavit, entitled "Fluor 2004 Highlights," reiterates these disclaimers. *See* DeLotto Affidavit, Exhibit 2 at 7.

Notwithstanding these disclosures in the summary benefit documents he received, Mr. DeLotto acknowledges that he did not request a copy of the plan's insurance policy of his employer or the LTDP administrator (1) when he was first enrolled in the plan in 2004, (2) when he chose to increase his benefit level by paying additional premiums, or (3) when he applied for disability benefits under the Policy.[9] He responds that he was unaware of these specific plan provisions so he had no reason to ask for a copy of the operative policy. This circular argument goes nowhere. Ignorance of the Policy terms, including his obligations as a condition of receiving disability benefits and the rights of Liberty Life under the Policy, cannot excuse Mr. DeLotto from being bound to such terms. He must take the benefits of the Policy as a beneficiary with all of the burdens imposed upon him by the Policy. *See generally Soto v. State Indus. Prods., Inc.*, 642 F.3d 67, 78 (1st Cir. 2011) (explaining that one may be bound by the terms of a contract despite ignorance of or not fully understanding the terms of the contract).

C.     Challenges to Reimbursement Agreement

Asserting that the Reimbursement Agreement constitutes a separate transaction independent of the Policy, Mr. DeLotto launches a barrage of attacks against its validity and enforceability in an effort to defeat Liberty Life's recoupment rights. All of these attacks miss

---

[9] In his affidavit, he avers that twice in 2007 while working for the company in Puerto Rico, he asked an employee in the local human resources department of Fluor Corp. for a copy of the LTDP insurance policy, but the employee put him off and he was never provided the policy. He did not pursue obtaining a copy, nor submit to his employer a written request for such copy, and he did not ask the LTDP plan administrator for a copy.

their target. In the first instance, Liberty Life's rights arise under the Policy. As discussed above,

the express terms of the Policy set forth the Benefit Election Requirement and Liberty Life's

rights of recoupment. They are the *quid pro quo* for a beneficiary choosing the Full Benefit

Option. The Reimbursement Agreement does not constitute a separate transaction or contract as

Mr. DeLotto argues. Essentially, it effectuates the Policy terms and is integral to the Policy. *See*

*In re Women's Tech. Inst.*, 200 B.R. at 81; *In re Lord*, 284 B.R. at 181.

       D.    <u>Recoupment Based on Child's Retroactive SSDI Award</u>

Mr. DeLotto takes umbrage with Liberty Life's reduction of his benefits based upon his

son's receipt of retroactive SSDI benefits. He notes that these SSDI benefits are issued under his

son's own social security number and deposited into a separate account maintained by his son's

mother, Mrs. Munro-DeLotto. He emphasizes that his son does not receive benefits under the

Policy and no documents were signed on his behalf relating to the Policy or the Reimbursement

Agreement. Therefore, he contends that there is no mutuality of debts between his son and

Liberty Life that would give rise to a right to recoup the retroactive SSDI benefits from Mr.

DeLotto's benefits payable under the Policy. The problem with this argument is that it ignores

the fact that these benefits are *derivative* of Mr. DeLotto's eligibility for SSDI benefits. They

were awarded to the child by virtue of his being a dependent of his disabled father.

I need only turn to the Policy, specifically sections 4 and 7, to dispose of this particular

challenge. Section 4 includes within the definition of "Other Income Benefits" (by which the

insured's benefits are to be reduced): "The amount of Disability and/or Retirement Benefits

under the United States Social Security Act . . . which: a. the Covered Person receives or is

eligible to receive; *and* b. his spouse, *child or children receives or are eligible to receive because

of his Disability*." *See* Objection, Exhibit A, § 4 (emphasis added). And section 7 states that

18

"Liberty Life has the right to recover any overpayment of benefits caused by . . . the Covered Person's receipt of any Other Income Benefits." *See* Objection, Exhibit A, § 7. In short, the Policy expressly includes such derivative SSDI benefits paid to the child as another source of income attributable to Mr. DeLotto when calculating his benefit amount. Liberty Life is within its legal rights to recoup from Mr. DeLotto's monthly benefits the overpayment resulting from his son's receipt of retroactive SSDI benefits.

      E.      <u>Other Asserted Considerations Barring Application of Equitable Recoupment</u>

Although presented as part of his challenge to the Reimbursement Agreement, Mr. DeLotto raises certain issues that go to the heart of the Policy provisions upon which he pins his assertion that there are unique considerations present barring the application of the equitable doctrine of recoupment.[10] Hence, I will address them although they cannot prevail.

First, he argues that because the Reimbursement Agreement purports to grant Liberty Life a lien against any SSDI awarded to him to the extent of an overpayment and requires him to hold such benefits in trust until it is repaid, Liberty Life is illegally "selling" a public benefit through its recoupment against his disability benefits.[11] Citing to 42 U.S.C. § 407, the anti-alienability provision of the Social Security Act, he maintains that Liberty Life is engaging in illegal conduct in contravention of the statute by enforcing its recoupment rights. In support of his position he relies upon the decision of my predecessor in *In re Hagan*, 41 B.R. 124 (Bankr. D.R.I. 1984).

---

[10] In his Response, Mr. DeLotto also asserted that the amount by which Liberty Life is reducing his monthly benefits is excessive and incorrect. This argument was confusing, and at the hearing he expressly waived it.

[11] Section 7 of the Policy, under the "Right to Recovery" heading, provides that Liberty Life may recover an overpayment by "placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis." Objection, Exhibit A, Policy, § 7, p. 4.

That case is inapposite,[12] and this argument was rejected by the *Bram* court. That court

distinguished post-petition deductions taken by the SSA for pre-petition overpayments because it

evaluates eligibility for Social Security benefits independently each month. *In re Bram,* 179 B.R.

824, 827 (Bankr. E.D. Tex. 1995) (discussing why the rationale in the *Hagan* case does not apply

to recoupment of SSDI overpayments by the insurer from the debtor's on-going monthly benefits

under a long-term disability policy). Liberty Life is not in any way selling, attaching, or

enforcing a purported lien against Mr. DeLotto's or his son's SSDI benefits. Irrespective of its

enforceability, the lien language in the Reimbursement Agreement has no impact here on Liberty

Life's recoupment rights under the Policy. All that Liberty Life is doing through its recoupment

is reducing (to zero) Mr. DeLotto's privately paid monthly disability benefits under the Policy

until the overpayment is repaid in full.

Second, Mr. DeLotto maintains that Liberty Life should be enjoined from exercising its

recoupment rights because of its inequitable conduct in imposing the Benefit Election

Requirement and demanding execution of the Reimbursement Agreement as a condition of the

continuation of the full benefit amount when he had "insufficient legal competency" to

understand the Reimbursement Agreement and its implications. Liberty Life refutes these

contentions, maintaining that "equitable contract principles" cannot defeat the unambiguous

terms of an ERISA-qualified plan. It cites as support the decision in *US Airways, Inc. v.*

---

[12] Judge Votolato held in the *Hagan* case that the SSA's post-petition reduction of the debtor's monthly
Supplemental Social Security Income benefits ("SSI") to recover a pre-petition overpayment of such benefits
constituted impermissible setoff in violation of the automatic stay. But his determination rested upon his conclusion
that there was not a single transaction involved because the SSA held a separate claim for recovery each and every
month as the debtor's eligibility for SSI was independently determined each month without regard to the amount of
previous benefit disbursements. (While a different benefit program, arguably the holding in *Hagan* would apply to
the SSA's reduction of post-petition SSDI benefits). In contrast, Mr. DeLotto's entitlement to disability benefits
under the Policy was not determined monthly; there was both a cap on the maximum amount payable and a term
limitation. "The Monthly Benefit will not: 1. exceed the Covered Person's Amount of Insurance; or 2. be paid for
longer than the Maximum Benefit Period," both as shown in the Schedule of Benefits. *See* Objection, Exhibit A,
Policy, § 4. And of course, the SSA was reducing a public benefit payable to the debtor (not a benefit under a private
insurance policy), thereby implicating the Social Security Act's anti-alienation clause.

*McCutchen*, which addressed an employee's challenge on equitable grounds to an action brought

by the administrator of an ERISA-qualified plan to recover an overpayment of medical expenses

paid as a result of the employee's recovery of funds from a third party in a personal injury action.

133 S.Ct. 1537, 1548 (2013). The Supreme Court rejected the employee's challenge. Viewing

the plan as being "at the center of ERISA," the Court opined that ERISA "countenances only

such relief as will enforce the *terms of the plan* or statute. . . . [a]nd precluding . . . equitable

defenses from overriding plain contract terms helps it to remain there." *Id*. (internal quotations

omitted); *see also Heimshoff v. Harford Life & Accident Ins. Co*., 134 S.Ct. 604, 612 (2013)

(discussing importance of enforcing ERISA plan terms).

It may well be, as Liberty Life contends, that the Supreme Court's rationale in *US
Airways* erects insurmountable hurdles for Mr. DeLotto. However, I will address his arguments

because he has asserted them as grounds to bar Liberty Life from exercising its recoupment

rights, which rights are themselves exempted from the Bankruptcy Code's automatic stay

provisions by virtue of an equitable doctrine. On their merits, however, his asserted equitable

defenses fall flat.

That multiple sclerosis can impair the cognitive functioning of individuals suffering from

the disease is well documented.[13] However, Mr. DeLotto bears the burden of establishing that his

cognitive impairment was so extreme at the relevant time as to render him legally incompetent to

choose between the Reduced Benefit Option and the Full Benefit Option. *See Rivera-Flores v.
Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 12-13 (1st Cir. 1997) (stating that the employee

bears the burden of producing competent medical evidence going to his capacity to knowingly

---

[13] *See* Kristen Rahn, Ph.D., Barbara Slusher, Ph.D., and Adam Kaplin, *Cognitive Impairment in Multiple Sclerosis:
A Forgotten Disability Remembered*, Cerebrum (November 30, 2012),
http://www.dana.org/Cerebrum/Default.aspx?id=39484, at text accompanying footnotes 2 and 3 ("Today physicians
recognize that MS affects more than 600,000 people in the United States and more than 2 million people worldwide,
and 40 to 65 percent of these patients experience some degree of cognitive impairment.").

and voluntarily execute documents); *DuFort v. Aetna Life Ins. Co.*, 818 F. Supp. 578, 583

(S.D.N.Y. 1993) ("The party asserting incompetence must prove that status at the time of the

disputed transaction, . . . an extremely heavy burden.") (internal quotation omitted). Mr. DeLotto

has provided no such medical evidence and has fallen far short of meeting this burden. I also

note that, as discussed below, his election of the Full Benefit Option was financially sound.

       Third (and last), Mr. DeLotto argues that because it came at a time of extreme financial,

emotional, and physical distress, the Benefit Election Requirement and the Full Benefit Option

were unconscionable and their imposition upon him by Liberty Life coercive and in bad faith by

changing the Policy terms. He concludes that such inequitable conduct should deprive Liberty

Life of enforcing its recoupment rights. During the hearing, Mr. DeLotto summed up his positon

by asserting that the Reduced Benefit Option was in reality no option at all because he could not

afford to lose nearly one-third of his income when he had not even been found eligible for SSDI

benefits. Under economic distress, he had no choice but to select the Full Benefit Option with its

corresponding repayment obligation.

       Liberty Life defends against this argument by attaching to the McGee Affidavit a copy of

the July 21, 2010 award letter it sent to Mr. DeLotto a year before requiring him to apply for

SSDI. That letter advised him of the Benefit Election Requirement and that he had to execute the

Reimbursement Agreement if he chose the Full Benefit Option. Thus, Liberty Life asserts that

Mr. DeLotto was fully informed that his benefit amount under the Policy was a supplement to

other benefits he receives, that he may in the future have to apply for such other benefits, and

that Liberty Life had the right to recover any overpayments that occurred from his receipt of such

other benefits. In pertinent part, the letter explained to Mr. DeLotto that:

              Your LTD Policy provides benefits at 60% of your pre-disability
              earnings *less benefits from other income. These include, but are*

> *not limited to, benefits under the United States Social Security Act . . .*
>
> In addition to your LTD benefit from Liberty Life . . . you may qualify for disability benefits from the Social Security Administration. Your Policy requires that you apply for Social Security Benefits, should your disability be expected to extend for twelve months . . .
>
> *If your benefit is overpaid, Liberty Life has the right to recover the amount overpaid in full. To avoid an overpayment, please notify our office if you return to work or begin receiving "other income benefits" as indicated in your Policy.*

McGee Affidavit (emphasis added).

Mr. DeLotto acknowledges receipt of this letter. His subjective interpretations of its explanation cannot override the Policy terms, and the fact remains that he did not make further inquiry of Liberty Life about the explanation or seek a copy of the Policy from Liberty Life to read the more detailed terms discussed briefly in this letter.

Once again, I can only imagine the awful emotional and economic pressures upon Mr. DeLotto and his family caused by his debilitating disease. Nonetheless, Liberty Life's pursuit of its recoupment rights, which were unambiguously set forth in the Policy, is neither in bad faith nor inequitable. The operative time period is not when Mr. DeLotto was forwarded the Reimbursement Agreement in the summer of 2011 and had to make his choice among the two benefit options (the Reduced Benefit Option or the Full Benefit Option). The operative periods here are (1) when Mr. DeLotto first became a participant in the Fluor Corp. LTDP and a beneficiary of the LTDP policy (subsequently replaced by the Liberty Life Policy) in 2004, and (2) when Mr. DeLotto first applied for disability benefits in 2010 and became entitled to benefits under the Policy. At the earlier time period, he became bound to all of the terms of whatever policy was in effect under the LTDP should he seek benefits for a future long-term disability. At

the latter time period when he applied for benefits under the Policy, he became bound, as did

Liberty Life, to all of the terms and conditions of that Policy.

Mr. DeLotto has not, understandably, cited to any authorities that have found a similar

Benefit Election Requirement or Full Benefit Option under a disability policy unconscionable,

for there is nothing inequitable or unconscionable about these provisions. *See In re Lord*, 284

B.R. 179 (Bankr. D. Mass. 2002); *In re Graves*, 234 B.R. 149 (Bankr. M.D. Fla. 1999); *In re*

*Bram)*, 179 B.R. 824 (Bankr. E.D. Tex. 1995). Actually, the Full Benefit Option is more

advantageous to the insured than to the insurer. Rather than face an immediate reduction in

monthly benefits while awaiting the outcome of a determination of eligibility for SSDI or

disability retirement benefits, a beneficiary under the Policy may elect to continue to receive the

full benefit amount until such time as he or she starts to receive benefits from any such other

sources. Having to repay any overpayments, which only arises if retroactive SSDI or disability

retirement benefits are awarded, is ordinarily not a hardship so long as the beneficiary remits to

the insurer the lump-sum retroactive payment received, such funds usually equal to the

overpayment due. Given (a) the uncertainty of the outcome; (b) the long delays (as occurred

here) in the eligibility determination process; (c) the incurrence of an overpayment only if such

other benefits are awarded retroactively; and (d) the availability of the lump-sum retroactive

funds with which to repay the overpayment, what beneficiary would not choose the Full Benefit

Option?

I do not doubt the sincerity of Mr. DeLotto's belief that he was under "economic duress"

when he had to select one of the two benefit options upon becoming eligible to apply for SSDI.

But, whatever economic hardship he faced stemmed from his inability to continue gainful

employment due to his debilitating disease, not the inclusion of the SSDI benefits in the

overpayment calculation because of the Policy's definition of "Other Benefits Income" or the

Benefit Election Requirement of the Policy. While he may not have liked having to choose

between the Reduced Benefit Option and the Full Benefit Option, it was still a choice afforded

him, and a provision set forth in the Policy well before the onset of his long-term disability. As

difficult as his circumstances are, he cannot turn the Policy into something greater than what was

contracted for by his former employer. It is designed to *supplement* all other sources of income

paid to or on behalf of a beneficiary and his dependents up to a cap of 60 percent in the

*aggregate* of the beneficiary's pre-disability earnings (subject to applicable maximum amounts).

Mr. DeLotto received his full benefit payments under the Policy for over a year before he chose

the Full Benefit Option and for a substantial period of time thereafter until the receipt of his and

his son's SSDI payments and retroactive awards. In exchange, under the equitable recoupment

doctrine, he must honor all of the Policy terms and his obligations as a beneficiary.

## VI.   Conclusion

Liberty Life's post-petition reduction of Mr. DeLotto's benefits to recover its pre-petition

overpayment in accordance with the Policy terms constitutes permissible recoupment that is an

exception to the automatic stay. No matter how unfortunate the consequences might be, its

exercise of such rights does not offend notions of equity or fairness. All four of Mr. DeLotto's

Motions must be and are DENIED.

Date: November 9, 2015                                    By the Court,

                                                         Diane Finkle
                                                         U.S. Bankruptcy Judge